UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Michelle Morgan, individually and on behalf of all other similarly situated,<br><br>              Plaintiff,<br><br>      v.<br><br>EssilorLuxottica S.A.; Luxottica Group S.p.A.; Essilor International SAS; EssilorLuxottica USA Inc.; Luxottica U.S. Holdings Corp.; Essilor of America Holding Company, Inc.; Luxottica of America, Inc.; Essilor of America Inc.; EyeMed Vision Care, LLC; and Vision Source, LLC,<br><br>              Defendants. | Case No. _____<br><br><br>CLASS ACTION COMPLAINT<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

I.    NATURE OF THE CASE ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................ 5

III.  PARTIES .......................................................................................................... 6

    A.     Plaintiff ................................................................................................... 6

    B.     Defendants ............................................................................................... 6

    C.     Co-Conspirators ...................................................................................... 8

    D.    Joint Corporate Operations ..................................................................... 8

IV.  FACTUAL ALLEGATIONS ............................................................................ 9

    A.     EssilorLuxottica ...................................................................................... 9

    B.     Mergers and Acquisitions ..................................................................... 10

    C.     Exclusionary Conduct .......................................................................... 13

    D.    Horizontal Restraints ............................................................................ 15

          1.     Exclusive Licensing Agreements with Fashion Houses ........................... 15

          2.     Sales Agreements with Competing Eyewear Entities ............................. 17

          3.     The Most Favored Nation Agreements ..................................................... 19

          4.     The Horizontal Agreements Facilitate Anticompetitive Pricing ............. 20

    E.     Vertical Restraints ................................................................................ 21

          1.     EyeMed .................................................................................................... 21

          2.     Vision Source .......................................................................................... 22

          3.     Steering ................................................................................................... 23

          4.     Minimum Resale Price Maintenance Agreements ................................... 24

    F.     Government Investigations and Fines .................................................... 24

V.   FRAUDULENT CONCEALMENT .............................................................. 25

VI.     MARKET DEFINITION.................................................................................27

VII.    MARKET POWER .....................................................................................28

VIII.   BARRIERS TO ENTRY ............................................................................31

IX.     ANTITRUST INJURY ...............................................................................32

X.      CLASS ACTION ALLEGATIONS............................................................33

XI.     CAUSES OF ACTION...............................................................................36

PRAYER FOR RELIEF .............................................................................39

DEMAND FOR JURY TRIAL ...................................................................40

Plaintiff Michelle Morgan ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to herself, and upon information and belief and the investigation of counsel as to all other matters, brings this class action lawsuit against Defendants EssilorLuxottica S.A.; Luxottica Group S.p.A.; Essilor International SAS; EssilorLuxottica USA Inc.; Luxottica U.S. Holdings Corp.; Essilor of America Holding Company, Inc.; Luxottica of America, Inc.; Essilor of America Inc.; EyeMed Vision Care, LLC; and Vision Source, LLC (collectively, "Defendants" or "EssilorLuxottica") for damages and injunctive relief pursuant to the federal antitrust laws, and demands a trial by jury on all matters so triable.

## I.     NATURE OF THE CASE

1.     EssilorLuxottica is a classic monopolist whose course of conduct in acquiring and maintaining its monopoly power plainly violates the antitrust laws. EssilorLuxottica both manufactures and distributes eyeglasses, sunglasses, and corrective lenses (collectively, "Eyewear") to retailers and sells them to consumers through its own retailers. Over the course of decades, EssilorLuxottica has consistently and repeatedly acquired major competitors to forestall any competition it might face. In some instances, it first weakened its competitors through underhanded and illegal means, such as by selling its own fake Oakley sunglasses to try to force Oakley to accept price concessions.

2.     Currently, EssilorLuxottica owns numerous luxury and premium brands, and it has exclusive distribution rights for most of the others locked up under very long-term contracts. EssilorLuxottica sells those brands in its own retail channels, and it prevents any authorized third-party retailers from competing on price through the use of most favored

nation and/or minimum resale price maintenance agreements. For the rare instances in which it does not own or have exclusive rights to distribute a luxury brand, EssilorLuxottica has reached long-term sales agreements that permit it to sell those brands through its owned and controlled retail channels, with terms that keep prices high and prevent price competition at the retail level.

3.      EssilorLuxottica also uses the leverage it possesses from its ownership of leading vision care insurers and optometrist group purchasing organizations to steer patients at thousands of supposedly "independent" eyecare professionals toward purchasing its own eyeglasses and sunglasses, rather than the products of its few remaining competitors.

4.      Consumers who purchase eyeglasses or sunglasses almost invariably do so from Defendants, although the vast majority do not know it because Defendants hold their products out to the public as separate brands manufactured by separate companies and sold through separate channels of distribution.

5.      Defendants are, collectively, an international, vertically integrated, corporate conglomerate. Through a series of acquisitions, licensing agreements, sales agreements, and steering practices, Defendants own or control an estimated 80% of the major brands in the global market for eyeglasses and sunglasses.[1] Defendants design, manufacture,

---

[1]  Ana Swanson, *Meet the Four-Eyed, Eight-Tentacled Monopoly That Is Making Your Glasses So Expensive*, Forbes (Sept. 10, 2014), *available at* https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=17dd3a006b66 (last visited Sept. 5, 2023).

distribute, and/or sell over 30 of the most popular consumer Eyewear brands in the United States. Defendants own many of the largest Eyewear retailers in the United States. They also own EyeMed, a vision benefits company, which in turn allows them to exercise control over more than 80% of the independent optometrists in the United States through EyeMed's contractual requirements and incentives for its in-network eyecare providers to carry and fit Defendants' Eyewear.[2]

6.      Defendants' collective market power has enabled them to engage in anticompetitive conduct, which has not escaped scrutiny from antitrust regulators. France's competition authority, Autorité de la concurrence, has targeted Defendants in at least two investigations. First, in *Decision No. 21-D-20 of July 22, 2021 relating to practices implemented in the eyewear and eyeglass frames sector*, the Autorité fined Luxottica 125,174,000€ for anticompetitive conduct related to frames for eyeglasses and sunglasses. Second, in *Decision No. 22-D-16 of October 6, 2022, relating to practices implemented in the optical lens sector*, the Autorité fined Essilor International SAS and EssilorLuxottica SA a combined 96,467,432€ for anticompetitive practices related to corrective lenses for eyeglasses and sunglasses.[3] Before their merger was finalized in October 2018, Essilor was

---

[2]  David Balto, *Get Ready to Pay When One Company Dominates the Eyeglass Market*, The Hill (Nov. 28, 2017), available at https://thehill.com/opinion/healthcare/362146-get-ready-to-pay-when-one-company-dominates-the-eyeglass-market/ (last visited Sept. 5, 2023).

[3]  "Corrective lenses," as used in this Complaint, refers to corrective ophthalmic lenses for eyeglasses or sunglasses. It does not refer to contact lenses unless otherwise specified. Corrective lenses are part of the Eyewear Market defined below and EssilorLuxottica's anticompetitive conduct described in this Complaint. Contact lenses are outside the Eyewear Market and irrelevant to Plaintiff's claims.

a global leader in corrective lenses and Luxottica was a global leader in sunglasses and eyeglass frames. The Autorité found that EssilorLuxottica had harmed competition by restricting sales of corrective lenses and frames through online channels of distribution. With respect to frames, the Autorité further found that EssilorLuxottica had also entered minimum resale price maintenance agreements with retailers.

7.      EssilorLuxottica's anticompetitive conduct spans decades. EssilorLuxottica has acquired leading Eyewear retailers and brands, repeatedly and consistently, including those that were tough competitors and leading market participants before EssilorLuxottica acquired them. EssilorLuxottica has also entered long-term, restrictive licensing and sales agreements that are often up to 10-15 years in duration, which excludes would-be rivals and entrants from being able to meaningfully compete with EssilorLuxottica. These include exclusive licensing agreements with well-known fashion houses, pursuant to which only EssilorLuxottica may sell the Eyewear at wholesale and can exercise control of retail sales through the chain of distribution; sales agreements with competing Eyewear companies, pursuant to which EssilorLuxottica pays competing Eyewear brands to sell their Eyewear to consumers with terms such as royalties or payment of a percentage of the sales that incentivizes those competitors not to compete on price through other retail sales outlets; and most favored nation agreements, pursuant to which third parties may not sell EssilorLuxottica's owned or exclusively licensed Eyewear brands at a lower price, Through its own actions and those of its subsidiaries, as well as its contracts with third parties, EssilorLuxottica controls the manufacture, distribution, and pricing of the lion's share of Eyewear purchased by consumers.

4

8.     Plaintiff brings this class action on behalf of the Rule 23 Class defined below to put a stop to Defendants' antitrust violations and recover damages for the harm caused by the conduct described in this Complaint.

II.     JURISDICTION AND VENUE

9.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and the Class by virtue of Defendants' violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

11.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and permits all process in such cases to be served in any district where the corporation may be found.

12.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants transacted business throughout the United States, including in this District; sold the products or services at issue throughout the United States, including in this District; had substantial contacts with the United States, including this District; and engaged in anticompetitive conduct that was directed at and had a foreseeable, direct, and intended

effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

III.    PARTIES

     A.    Plaintiff

13.    Plaintiff Michelle Morgan is a Minnesota resident who purchased, for her personal or household consumption, one or more of EssilorLuxottica's Proprietary Brands or Licensed Brands of Eyewear directly from one or more of Defendants' Retail Outlets or Defendants' co-conspirators during the Class Period (defined below).

     B.    Defendants

14.    Defendant EssilorLuxottica S.A. is a joint stock company incorporated under the laws of France, with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France. EssilorLuxottica S.A. was formed from the 2018 merger of Luxottica Group S.p.A. and Essilor International SAS. EssilorLuxottica S.A. owns GrandVision BV.

15.    Defendant Luxottica Group S.p.A. is a corporation organized under the laws of Italy with its principal place of business at Piazzale Luigi Cadorna 3, 20121 Milan, Italy, and an office in the United States at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica Group S.p.A. owns Defendant Luxottica U.S. Holdings Corp. and online retailer Glasses.com. Luxottica Group S.p.A. also owns Alain Mikli, Arnette, Costa Del Mar, Inc., Oakley, Inc., Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear (collectively, "Proprietary Brands"), and holds exclusive licenses for the Eyewear brands of the Fashion Houses (defined below). To the extent that several of the Fashion Houses have renewed their licensing agreements since the merger of Luxottica Group

6

S.p.A. and Essilor International SAS, EssilorLuxottica S.A. may hold these licensing agreements directly.

16.     Defendant Essilor International SAS is a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France. Essilor International SAS owns Defendant Essilor of America Holding Company, Inc., Costa Del Mar, Inc., and Defendant Vision Source, LLC.

17.     Defendant EssilorLuxottica USA Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. EssilorLuxottica USA Inc. is a holding company for EssilorLuxottica S.A.'s North American business activities.

18.     Defendant Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business at 44 Harbor Park Drive, Port Washington, New York 11050. Luxottica U.S. Holdings Corp. owns Defendant Luxottica of America, Inc.

19.     Defendant Essilor of America Holding Company, Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. Essilor of America Holding Company, Inc. owns Defendant Essilor of America Inc.

20.     Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica of America, Inc., owns Eyewear retailers LensCrafters, Pearle Vision, Target Optical, and Sunglass Hut (together with Oakley retail stores, Ray-Ban retail stores, Glasses.com,

FramesDirect.com, and For Eyes, "Retail Outlets"). Luxottica of America, Inc., also owns Defendant EyeMed Vision Care, LLC.

21.     Defendant Essilor of America Inc. is a Delaware corporation with its principal place of business at 13555 N. Stemmons Fwy, Dallas, Texas 75234. Essilor of America Inc. owns Defendants Vision Source and Frames for America, Inc.

22.     Defendant EyeMed Vision Care, LLC, is a company formed under the laws of Delaware with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040 United States. Defendant Luxottica of America, Inc., owns Defendant EyeMed Vision Care, LLC.

23.     Defendant Vision Source, LLC, is a company formed under the laws of Texas with its principal place of business at 23824 Highway 59 N, Kingwood, Texas 77339. Defendant Essilor International SAS owns Defendant Vision Source, LLC.

C.     Co-Conspirators

24.     The members of the Captive Optometrist Groups (defined below), the in-network eyecare professionals with EyeMed, and the Third Party Sellers are unnamed co-conspirators. Their agreements with the named Defendants are anticompetitive restraints of trade that resulted in or supported EssilorLuxottica's market power and collection of monopoly rents for the sale of its Eyewear to end consumers (i.e., the Class members).

D.     Joint Corporate Operations

25.     With respect to the anticompetitive conduct described in this Complaint, all Defendants operate together as a single commercial entity and act as the agents of EssilorLuxottica. Their collective goal is EssilorLuxottica's domination of the Eyewear

Market (defined below) and collection of monopoly rents for the sale of its Eyewear, both directly and through third-party channels.

IV.   FACTUAL ALLEGATIONS

A.   EssilorLuxottica

26.   EssilorLuxottica is a vertically integrated, multinational, corporate conglomerate that designs, manufactures, distributes, and sells eyeglasses, sunglasses, corrective lenses, and vision benefits to consumers. Eyeglass frames, sunglasses, and corrective lenses are referred to collectively in this Complaint as "Eyewear."

27.   EssilorLuxottica is the world's largest conglomerate in the Eyewear industry. In 2014, EssilorLuxottica reportedly owned an estimated 80% of the major brands of eyeglasses globally.[4] Given its acquisitions since 2014, that number has likely only increased.

28.   Through its control of the vision benefits company, EyeMed, owned chain retail outlets, and affiliated eyecare providers, EssilorLuxottica is among the largest players in both the vision benefits and eyecare industries. EssilorLuxottica also exerts control over a reported 83% of optometrists in the United States.[5]

29.   EssilorLuxottica has obtained market power in the Eyewear Market (defined below) through a series of acquisitions, anticompetitive agreements, and steering practices.

30.   With that market power, EssilorLuxottica has charged monopoly rents for its Eyewear. Both the prices to consumers and EssilorLuxottica's margins have increased,

---

[4]  *See* Swanson, supra n.1

[5]  Balto, supra n.2.

which is a classic sign of reduced competition and market power.[6] For instance, in 2012, Luxottica reported an increase in its operating margin from 12.2% to 14.2% from 2011 to 2012, and in 2023, EssilorLuxottica announced that its adjusted operating margin had increased to 16.8% from 16.1% in 2021.[7] Since EssilorLuxottica was formed, its global gross profit has increased from a reported €10.2 billion in 2018 to €15.5 billion in 2022.[8]

      B.    <u>Mergers and Acquisitions</u>

      31.    Luxottica Group S.p.A. began as an eyeglass frames company in Italy in 1961.

      32.    Essilor International SAS has roots in a network of eyeglass assembly shops in Paris as far back as 1849. Essilor International SAS was formed in 1972 as a legal entity. Essilor International SAS is the largest global manufacturer of corrective lenses. It also owns consumer Eyewear brands and retail outlets.

      33.    EssilorLuxottica owns numerous well-known, popular, and commercially successful Eyewear brands, including Alain Mikli, Arnette, Costa Del Mar, Foster Grant,

---

[6] *See* Balto, supra n.2 ("Since Luxottica bought Ray-Ban almost 20 years ago, the average selling price has gone up, and so have Luxottica's profit margins.").

[7] *Luxottica Profits, Sales Grow*, Luxottica, https://www.luxottica.com/sites/luxottica.com/files/wwd_0.pdf (last visited Sept. 29, 2023); *Full Year 2022 Results*, EssilorLuxottica, https://www.essilorluxottica.com/en/cap/content/101690/ (last visited Sept. 29, 2023); *FY 2022 Results*, EssilorLuxottica, https://www.essilorluxottica.com/en/newsroom/press-releases/fy-2022-results/ (last visited Sept. 29, 2023).

[8] *Global Gross Profit of EssilorLuxottica from 2018 to 2022*, Statista, https://www.statista.com/statistics/241586/global-gross-profits-of-luxottica/ (last visited Sept. 29, 2023).

Oakley, Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear (collectively, "Proprietary Brands").

34.    EssilorLuxottica acquired these Proprietary Brands over time:

- 1981: Sferoflex

- 1990: Vogue Eyewear

- 1995: Persol

- 1999: Ray-Ban; Arnette

- 2007: Oakley; Oliver Peoples

- 2010: Foster Grant

- 2013: Alain Mikli; Starck Biotech Paris

- 2014: Costa Del Mar

35.    EssilorLuxottica owns numerous well-known, popular, and commercially successful Eyewear retailers, including Cole National, For Eyes, FramesDirect.com, Glasses.com, LensCrafters, Oakley Stores, Pearle Vision, Sunglass Hut, and Target Optical (collectively, "Retail Outlets"). These Retail Outlets have more than 3,800 brick-and-mortar stores throughout the United States, as well as online operations.

36.    EssilorLuxottica acquired its Retail Outlets over time:

- 1995: LensCrafters

- 2001: Sunglass Hut

- 2004: Pearle Vision; Target Optical; Cole National

- 2007: Oakley Stores

- 2009: FramesDirect.com

- 2014: Glasses.com

- 2021: For Eyes

37.    EssilorLuxottica also owns significant, successful eyecare groups, including Vision Source (a group of 3,100 optometry practices) and the Professional Eyecare Resources Cooperative ("PERC") and Infinity Vision Alliance ("IVA") (optometry group purchasing organizations) (collectively, "Captive Optometrist Groups").

38. EssilorLuxottica acquired its Captive Optometrist Groups—specifically, Vision Source, PERC, and IVA—in a series of acquisitions in 2015.

39.    EssilorLuxottica also owns EyeMed, a well-known, popular, and commercially successful vision-benefits business.

40.    EssilorLuxottica acquired and reinforced its vision-benefits business over time:

- 1998: EyeMed

- 2001: First American Health Concepts (now operates under EyeMed)

41.    EssilorLuxottica has also long been a leading Eyewear manufacturer. It fueled its growth as a vertically integrated Eyewear conglomerate by acquiring numerous manufacturing companies, including those that manufacture proprietary products, such as Transitions Optical, which was the first company to manufacture plastic photochromatic lenses (commonly known as Transitions® lenses). EssilorLuxottica's acquisitions of manufacturing companies include:

- 1995: Gentex Optics

- 2003: OPSM

- 2008: Satisloh

- 2013: Xiamen Yarui Optical Co., Ltd., d/b/a Bolon

- 2014: Transitions Optical

- 2018: Fukui Megane (manufacturer, 67% stake)

- 2019: Barberini (manufacturer)

42.     EssilorLuxottica further expanded its global dominance through additional acquisitions outside the United States:

- 2012: Tecnol (a vertically integrated Eyewear company based in Brazil)

- 2016: MyOptique (a retailer based in the United Kingdom); Salmoiraghi & Viganò (a retailer based in Italy)

- 2017: Óticas Carol (a retailer based in Brazil)

- 2019: GrandVision (a retail group based in the Netherlands); Brille24 (a retailer based in Germany)

C.     <u>Exclusionary Conduct</u>

43.     Some of EssilorLuxottica's acquisitions have been made possible only by its exclusionary conduct in the Eyewear market.

44.     As one former Luxottica manager put it, Luxottica "is all about domination." Market domination has reportedly long been Luxottica's purpose and goal, particularly

under the leadership of Leonardo Del Vecchio, who became the second wealthiest person in Italy in 1994 and held that title until his death in 2022. Del Vecchio reportedly ruled by fear, and opticians have been reluctant to even say his name to reporters for fear of "getting a horse's head in the bed." [9]

45.     After acquiring Sunglass Hut, Luxottica demanded price concessions from its suppliers. The most significant supplier—Oakley—refused. In 2001, Luxottica and Oakley executives met to negotiate an agreement. A few months later, in November 2001, Sunglass Hut stopped selling Oakley sunglasses. Sunglass Hut made up about 25% of Oakley's business, and Oakley's share price fell by 37%.[10]

46.     Luxottica began producing Ray-Ban sunglasses that looked like Oakley sunglasses, such as by using bright blue and green lenses that looked just like Oakley's trademarked "Ice" and "Emerald" colored lenses. As one former Luxottica executive put it: "We were doing stuff like creating fake Oakleys. There was a kind of war going on."[11]

47.     Oakley sued in 2001, and Oakley and Luxottica eventually reached a settlement agreement. Instead of continuing to compete, Luxottica acquired Oakley in 2007 for $2.1 billion.[12]

---

[9] Sam Knight, *The Spectacular Power of Big Lens*, The Guardian (May 10, 2018), https://www.theguardian.com/news/2018/may/10/the-invisible-power-of-big-glasses-eyewear-industry-essilor-luxottica (last visited Sept. 9, 2023).

[10] *Id.*

[11] *Id.*

[12] *Id.*

48.     Oakley is not the only acquisition fueled by sharp-elbowed business practices in pursuit of market dominance. Luxottica acquired US Shoe—which owned LensCrafters—in 1995 in a hostile takeover for $1.4 billion. US Shoe's board did not want to sell, and the company was five times larger than Luxottica. Once the deal was done, Luxottica promptly stripped US Shoe down to its parts and kept only the LensCrafters stores in order to have a retail outlet for Luxottica frames.[13]

D.     Horizontal Restraints

1.     *Exclusive Licensing Agreements with Fashion Houses*

49.     EssilorLuxottica produces and distributes Eyewear for brands owned by third parties. As described below, it has exclusive rights to do so, and those rights are locked in by very long-term contracts, which prevents any actual or potential rivals from acquiring rights to produce or distribute these important brands.

50.     EssilorLuxottica enters into exclusive licensing agreements with many major fashion houses, including BBGI US, Inc., Brunello Cucinelli S.p.A., Brunello Cucinelli, USA, Inc., Bulgari S.p.A., Bulgari Corporation of America, Burberry Group plc, Burberry Limited, Chanel Ltd, Chanel, Inc., Dolce & Gabbana S.r.l., Dolce & Gabbana USA Inc., Ferrari S.p.A., Gianni Versace S.r.l., Versace USA, Inc., Giorgio Armani S.p.A., Giorgio Armani Corporation, Michael Kors (USA), Inc., Prada S.p.A., Prada USA Corporation, Ralph Lauren Corporation, Tapestry, Inc., Tiffany & Co., and Tory Burch LLC (collectively, "Fashion Houses").

---

[13] *Id.*

51.     The Fashion Houses' Eyewear brands include major, well known, positively recognized brands such as Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana, Emporio Armani, Giorgio Armani, Michael Kors, Miu Miu, Native, Polo by Ralph Lauren, Ralph Lauren, Swarovski, Tiffany & Co., Tory Burch, and Versace (collectively, "Licensed Brands").

52.     The Fashion Houses produce clothing and accessories, including Eyewear. The Fashion Houses are horizontal competitors in the Eyewear Market with EssilorLuxottica's Proprietary Brands.

53.     EssilorLuxottica has entered into exclusive licensing agreements with the Fashion Houses related to their Licensed Brands over time, including:

- 1988: Giorgio Armani

- 1992: Brooks Brothers

- 1997: Bulgari

- 1999: Chanel

- 2003: Prada; Versace

- 2006: Dolce & Gabbana; Burberry

- 2007: Ralph Lauren

- 2008: Tiffany

- 2009: Tory Burch

- 2012: Coach

- 2015: Michael Kors

- 2022: Swarovski

- 2023: Eastman Kodak Company; Jimmy Choo Eyewear

54.     EssilorLuxottica has maintained these exclusive licensing arrangements over time, including signing lengthy renewal agreements with the Fashion Houses. These agreements are often 10 years, and sometimes as long as 15 years. The length of these contracts has limited the ability of competitors or entrants to compete because they cannot even hope to contract with the Fashion Houses to distribute their brands of Eyewear.

55.     The licensing agreements between EssilorLuxottica and the Fashion Houses are exclusive multi-year licenses for the design, manufacture, and distribution of the Fashion Houses' Licensed Brands of Eyewear, including distribution into, within, and throughout the United States (the "Exclusive Licensing Agreements"). Under the Exclusive Licensing Agreements, EssilorLuxottica pays the Fashion Houses royalties on the sale of their Licensed Brands of Eyewear.

56.     The Exclusive Licensing Agreements give EssilorLuxottica the authority to set prices for the Licensed Brands of Eyewear, or otherwise provide the means for EssilorLuxottica to control, maintain, and inflate the prices for all the Licensed Brands of Eyewear in the United States.

*2.     Sales Agreements with Competing Eyewear Entities*

57.     EssilorLuxottica enters sales agreements with third party Eyewear manufacturers, owners, or license holders ("Competing Eyewear Entities") who are horizontal competitors in the Eyewear Market with EssilorLuxottica's Proprietary Brands.

Under these agreements, EssilorLuxottica controls the sale and sales price of the Competing Eyewear Entities' Eyewear in EssilorLuxottica's Retail Outlets.

58.   The Competing Eyewear Entities include Kering S.A., Kering Eyewear S.p.A., Kering Eyewear USA, Inc., LVMH Moët Hennessy Louis Vuitton SE, LVMH Moët Hennessy Louis Vuitton Inc., Christian Dior SE, Christian Dior, Inc., Marcolin S.p.A., Marcolin U.S.A. Eyewear Corp., Thélios S.p.A., and Thelios USA Inc.

59.   The Competing Eyewear Entities' brands of Eyewear include well-known, commercially successful brands such as:

- Kering: Balenciaga; Chloe; Gucci; Maui Jim; Saint Laurent

- Marcolin: Tom Ford

- Christian Dior: Dior

- LVMH and Thélios: Celine; Fendi

60.   The sales agreements with Competing Eyewear Entities are lengthy, multi-year licenses for the sale and distribution of the Competing Eyewear Entities' brands of Eyewear (the "Sales Agreements"). Under the Sales Agreements, EssilorLuxottica pays the Competing Eyewear Entities royalties or a portion of the gross total sales of their Eyewear sold through EssilorLuxottica's Retail Outlets. This method of payment, rather than a fixed amount of dollars per product, incentivizes the Competing Eyewear Entities to avoid price competition with EssilorLuxottica at the retail level through their own retail outlets or from other retail outlets they reach distribution agreements with.

61.   The Sales Agreements grant EssilorLuxottica the authority to set prices for the Competing Eyewear Entities' brands of Eyewear, or otherwise provide the means for

EssilorLuxottica to control, maintain, and inflate the prices for the Competing Eyewear Entities' brands of Eyewear. These agreements both allow EssilorLuxottica to collect higher prices for its Retail Outlets' sales of the Competing Eyewear Entities' brands, and to continue to charge higher prices for its own Proprietary Brands and Licensed Brands by eliminating competition between the Competing Eyewear Entities' brands and its own Proprietary Brands and Licensed Brands. Meanwhile, the Competing Eyewear Entities benefit from the agreements by receiving royalties and a portion of the gross total sales of their Eyewear sold through EssilorLuxottica's Retail Outlets and by avoiding price competition with EssilorLuxottica.

### 3.   *The Most Favored Nation Agreements*

62.     EssilorLuxottica distributes its Proprietary Brands and Licensed Brands to third parties for resale ("Third Party Sellers") under certain, limited terms and conditions. In particular, these agreements include pricing restrictions, such as most-favored nation, or MFN, clauses, which prevent the Third Party Sellers from selling the Proprietary Brands or Licensed Brands at a discounted rate ("MFN Agreements"). The MFN Agreements prevent price competition and allow EssilorLuxottica to keep prices high and collect supracompetitive prices from consumers.

63.     Monopolists often use MFN provisions to lock down their market dominance. Having acquired market power, they prevent competition—in this case, at the retail level—by preventing any actual or potential competitors from undercutting them on price. Both the Retail Outlets and the Eyewear products they sell are established brands

such that if competitors cannot beat them on price, they cannot acquire a sufficient customer base to pose a real competitive threat to EssilorLuxottica.

        *4.    The Horizontal Agreements Facilitate Anticompetitive Pricing*

64. The Exclusive Licensing Agreements, Sales Agreements, and MFN Agreements result in unfair, supracompetitive prices.

65. EssilorLuxottica's control over the pricing of the Licensed Brands and the Competing Eyewear Entities' brands allows it to charge supracompetitive prices.

66. EssilorLuxottica does not inform customers in its Retail Outlets that it is the exclusive licensee, manufacturer, or distributor of the vast majority of the Eyewear it sells.

67. EssilorLuxottica does not inform customers in its Retail Outlets that it has contractual agreements with its horizontal competitors that ensure the Proprietary Brands, Licensed Brands, and Competing Eyewear Entities' brands are artificially inflated.

68. Through the Exclusive Licensing Agreements, Sales Agreements, and MFN Agreements, EssilorLuxottica ensures that the Proprietary Brands, Licensed Brands, and Competing Eyewear Entities' brands of Eyewear are priced above competitive levels within its Retail Outlets and at Third Party Sellers.

69. Publicly available information confirms the supracompetitive prices of these brands of Eyewear. Some industry observers have estimated that the markup on Eyewear runs as high as 1,000%. Dean Butler, founder of LensCrafters, has explained that consumers could purchase designer-quality frames for $15 and "first-quality lenses for $1.25 apiece." As he put it, the retail price of Eyewear in the United States is "a complete rip-off." As an example, many non-prescription Ray-Ban sunglasses retail for hundreds of

dollars, with some even over $1,000. Oliver Peoples non-prescription sunglasses sell at Sunglass Hut anywhere from nearly $400 to as high as $1,750. These prices, as well as those for all other brands of Eyewear owned or controlled by EssilorLuxottica, would fall in a competitive marketplace.

E.    Vertical Restraints

70.    Defendants use a variety of vertical restraints in their business. Some of these restraints, on their own, allow Defendants to collect supracompetitive prices for their Eyewear and prevent discounting or lower prices by Third Party Sellers. Just as importantly, these vertical restraints help Defendants to maintain their monopoly power.

71.    As discussed in more detail below, Defendants have under their umbrella leading vision benefits providers and networks of optometric practices that enable them to steer Class members to their own Proprietary Brands and Licensed Brands of Eyewear. Defendants also use their MFN Agreements, or resale price maintenance agreements, to prevent price competition by Third Party Sellers—which both keeps prices high and prevents entry or competition from actual or potential rivals.

1.    *EyeMed*

72.    EyeMed is a wholly owned subsidiary of EssilorLuxottica, and one of the largest vision benefits companies in the United States.

73.    EyeMed insures nearly 72 million individuals and touts itself as "America's fastest growing vision benefits company" with "America's largest vision network."

74.    EssilorLuxottica exercises control over a reported 83% of optometrists in the United States.

75.     EyeMed requires, or financially incentivizes, its in-network providers to market or sell EssilorLuxottica's Eyewear to consumers. EyeMed also directly markets EssilorLuxottica's Eyewear to consumers.

2.     *Vision Source*

76.     Vision Source, a wholly owned EssilorLuxottica subsidiary, contracts with supposedly "independent" eyecare professionals for the sale of EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear.

77.     Many of these eyecare professionals are formally part of the EssilorLuxottica corporate structure because they are members of Vision Source, which describes itself as "a family of 3,100 locally owned optometric practices and more than 4,500 doctors collaborating to provide quality professional eye care and to support the long-term success of independent optometry."[14]

78.     Vision Source's network treats an estimated 16 million patients annually. Collectively, this network comprises the largest optical retailer in the United States.

79.     Each of Vision Source's 3,100 optometric practices is a franchisee that is required to maintain or market a certain inventory of Proprietary Brands and Licensed Brands of Eyewear or to ensure that a certain portion or gross total of its Eyewear sales to EyeMed members are based on Proprietary Brands and Licensed Brands of Eyewear.

80.     Many Vision Source franchisees do not identify to consumers that they are tied to Vision Source or EssilorLuxottica. Instead, they hold themselves out as independent

---

[14] *What is Vision Source?*, Vision Source Signature Eye Care, https://visionsource.com/about/ (last visited Sept. 10, 2023).

eyecare professionals, from whom consumers expect independent judgment about what Eyewear to carry and fit and how to price it.

### 3.   Steering

81.   EyeMed markets its Captive Optometrist Groups' services to its insureds without disclosing their relationship. In exchange, these eyecare professionals accept certain reimbursement rates from EyeMed and agree to certain contractual terms that benefit EssilorLuxottica.

82.   EyeMed requires all of its in-network eyecare professionals "to be in good standing with EssilorLuxottica and all relevant subsidiaries."

83.   EyeMed requires its in-network eyecare professionals to "use our network labs… for all EyeMed member eyewear." This network includes "Essilor labs, Walman labs and Luxottica Lab Services (LLS)."

84.   EyeMed requires its in-network eyecare professionals "to order lenses listed in the Essilor or Luxottica Lab Services product catalogs."

85.   EyeMed steers patients to members of its Captive Optometrist Groups and eyecare professionals who are contractually committed to providing EssilorLuxottica products and services, sometimes exclusively.

86.   EyeMed also uses a tiered marketing system to further steer patients. It advertises a category of "PLUS Providers" whom it promises its insureds will "maximize your benefits, with extra coverage to help you save even more."

87.   PLUS Providers are in-network eyecare professionals who are owned by EssilorLuxottica, Vision Source franchisees, or have entered additional agreements with

EyeMed or EssilorLuxottica to maintain or market a certain inventory of EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear.

88.      Eyecare professionals who participate in this scheme may feel they have no choice. EyeMed occupies a dominant position in the vision benefits market. These eyecare professionals cannot risk losing access to EyeMed's 72 million insureds.

> *4.      Minimum Resale Price Maintenance Agreements*

89.      The MFN Agreements described are both horizontal and vertical agreements because EssilorLuxottica is vertically integrated.

90.      Third Party Sellers compete horizontally with EssilorLuxottica's Retail Outlets, such as Target Optical and Sunglass Hut.

91.      Third Party Sellers are vertically restrained in their pricing ability, particularly their ability to discount or promote discounts. These MFN Agreements therefore also operate as minimum resale price maintenance ("RPM") agreements ("RPM Agreements").

> F.      <u>Government Investigations and Fines</u>

92.      France's competition authority, Autorité de la concurrence, has targeted Defendants in at least two investigations.

93.      In *Decision No. 21-D-20 of July 22, 2021 relating to practices implemented in the eyewear and eyeglass frames sector*, the Autorité fined Luxottica Group S.p.A. and Luxottica France SASU 125,174,000€ for anticompetitive conduct related to frames for eyeglasses and sunglasses.

94.     In *Decision No. 22-D-16 of October 6, 2022, relating to practices implemented in the optical lens sector*, the Autorité fined Essilor International SAS and EssilorLuxottica SA a combined 96,467,432€ for anticompetitive practices related to corrective lenses for eyeglasses and sunglasses. The Autorité found that Essilor International SAS and EssilorLuxottica SA had harmed competition by restricting sales of corrective lenses and frames through online channels of distribution. With respect to frames, the Autorité further found that Essilor International SAS and EssilorLuxottica SA had also entered minimum resale price maintenance agreements with retailers.

95.     The investigation and findings of the Autorité confirm that EssilorLuxottica has engaged in anticompetitive practices designed to maintain market power and supracompetitive prices for Eyewear, including through RPM Agreements.

V.     FRAUDULENT CONCEALMENT

96.     Defendants concealed the terms of their unlawful agreements, as described in this Complaint, from Plaintiff and Class members. Plaintiff and Class members were not placed on actual, constructive, or inquiry notice of Defendants' antitrust violations by any facts that were known or reasonably should have been known to them.

97.     The Licensing Agreements, Sales Agreements, and the agreements between EyeMed and its in-network providers contain provisions preventing the parties from disclosing the agreements' terms to the public.

98.     Defendants deceive reasonable consumers about the existence of competition in the Eyewear Market by holding themselves out as so many separate brands and retailers,

when in fact, all the Eyewear brands and Eyewear retailers discussed in this Complaint are owned or controlled by EssilorLuxottica.

99.    Defendants used phone conversations and deletion of emails to avoid detection of their unlawful conduct. For instance, the commercial director of Luxottica France sent an internal email on December 11, 2008, stating:

> Philippe can you contact the optician on this point ONLY BY TELEPHONE.
>
> PLEASE DELETE ALL YOUR EMAILS ON THIS SUBJECT IMMEDIATELY.[15]

This email communication related to Defendants' minimum resale price maintenance agreements with eyecare professionals and the legal compliance issues and legal risks related thereto.

100.   Defendants' internal emails make clear that their vertical restraints were not limited to France. For instance, the marketing director of Luxottica UK sent an internal email stating that, if resellers did not charge the high prices Luxottica wanted, "we are not obliged to collaborate."[16]

101.   EssilorLuxottica acted as a unified entity with respect to the antitrust violations alleged in this Complaint. EssilorLuxottica engaged in the same anticompetitive conduct in the United States as it did in Europe. It is likely that EssilorLuxottica took similar steps to conceal its actions within, and targeted at, the United States.

---

[15] Emphasis in original. The content of this email was machine translated.

[16] Emphasis in original. The content of this email was machine translated.

102.   The statute of limitation is tolled because of Defendants' fraudulent concealment. Accordingly, claims for purchases prior to the four-year limitations period are not time barred.

103.   Plaintiff and the Class seek damages for purchases between 2007 and the date of class certification (the "Class Period").

## VI.   MARKET DEFINITION

104.   The relevant product market is the market for Eyewear sold to consumers (the "Eyewear Market").

105.   The Eyewear Market does not include contact lenses. Contact lenses are not part of the Eyewear Market because they are not a reasonably interchangeable substitute for eyeglasses, sunglasses, or corrective lenses for eyeglasses or sunglasses. Consumers would not switch from eyeglasses or sunglasses to contact lenses because of a small but significant non-transitory increase in price. For instance, contact lenses do not reduce brightness or shield eyes from ultraviolet radiation. Some consumers may not be able to wear contact lenses due to comfort or health reasons. Some consumers prefer to wear Eyewear as a fashion statement. And consumers who choose to primarily wear contact lenses for vision correction often also need to wear eyeglasses or prescription sunglasses sometimes, as contact lenses are generally recommended to be worn for only a limited number of hours each day. *See In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1303 (M.D. Fla. 2016) (upholding allegations that disposable contact lenses were a relevant product market separate from eyeglasses or corrective vision surgery).

106.    The Eyewear Market does not include corrective vision surgery, such as LASIK, PRK, or PHAKIC IOL. Consumers would not switch from eyeglasses or sunglasses to having surgery on their eyes because of a small but significant non-transitory increase in price. For instance, corrective vision surgery does not reduce brightness or shield eyes from ultraviolet radiation. Some consumers may not be able to have corrective vision surgery, or may not wish to undergo surgery, due to comfort, health, or financial reasons. And some consumers prefer to wear Eyewear as a fashion statement.

107.    The geographic scope of the Eyewear Market is the United States as a whole. Defendants distribute and sell their Eyewear throughout the United States in nationwide networks of brick-and-mortar retail stores, to optometrists and other sellers, and online through internet channels.

VII.    MARKET POWER

108.    EssilorLuxottica has market power in the Eyewear Market.

109.    EssilorLuxottica has more than half of the market share for the Eyewear Market in the United States.

110.    EssilorLuxottica owns or controls 80% of the major brands in the global eyeglasses industry.[17]

---

[17] *See* Swanson, supra n.1.

111.    EssilorLuxottica accounts for 69.4% of industry revenue for sales of sunglasses.[18]

112.    EssilorLuxottica holds a reported 42-45% share of the global market for corrective lenses.[19]

113.    EssilorLuxottica exerts control over 83% of optometrists in the United States through its ownership of EyeMed, which helps EssilorLuxottica steer patients to its own products.

114.    There are no substantial, material rivals to EssilorLuxottica in the eyewear market. EssilorLuxottica's large—and consistently increasing—revenues and profit margins confirm this point. For instance, EssilorLuxottica's annual revenue for 2022 was nearly $25.8 billion, which was a 10% increase from 2021. In 2021, EssilorLuxottica's annual revenue was $23.4 billion, which was a 42% increase from 2020. These increases in revenue speak to EssilorLuxottica's ability to collect monopoly rents.

115.    EssilorLuxottica enjoys high margins that have increased in recent years. For instance, in July 2022, EssilorLuxottica announced that its adjusted operating margin rose

---

[18] *EssilorLuxottica SA – Company Profile*, IBISWorld, https://www.ibisworld.com/us/company/essilorluxottica/429641/ (last visited Sept. 9, 2023).

[19] Distribution of the Corrective Lens Global Market as of 2019, By Company, Statista, https://www.statista.com/statistics/1087381/share-of-global-cardiovascular-market-by-company/ (last visited Sept. 9, 2023); Sam Knight, *The Spectacular Power of Big Lens*, The Guardian (May 10, 2018), https://www.theguardian.com/news/2018/may/10/the-invisible-power-of-big-glasses-eyewear-industry-essilor-luxottica (last visited Sept. 9, 2023).

by 100 basis points to 18.4% in just the first half of 2022.[20] EssilorLuxottica's margins have increased steadily over an extended period of time. For instance, in 2012, Luxottica reported an increase in its operating margin from 12.2% to 14.2% from 2011 to 2012, and in 2023, EssilorLuxottica announced that its adjusted operating margin had increased to 16.8% from 16.1% in 2021. Since EssilorLuxottica was formed, its global gross profit has increased from a reported €10.2 billion in 2018 to €15.5 billion in 2022.

116.    EssilorLuxottica has no true rivals. Warby Parker, for instance, entered the market by creating a direct-to-consumer Eyewear company in 2010 that offered Eyewear at lower cost to consumers through internet sales. It now sells most of its Eyewear in brick-and-mortar retail stores. Despite having the second largest market share in the Eyewear Market, it is dwarfed by EssilorLuxottica: EssilorLuxottica has approximately 5.5 times the market share that Warby Parker has. In its securities filings, Warby Parker has described the market as "fragmented" with the notable exception of EssilorLuxottica, a "large, integrated" company with "multiple brands and retail banners."[21]

117.    LensCrafters' founder, Dean Butler, has said of EssilorLuxottica: "If that's not a monopoly, I don't know what is."

---

[20]  Reuters, *EssilorLuxottica Improves Margin in Challenging Market*, The Business of Fashion (July 29, 2022), https://www.businessoffashion.com/news/luxury/essilorluxottica-improves-margin-in-challenging-market/ (last visited Sept. 10, 2023).

[21]  Warby Parker Annual Report 2022, *available at* https://www.sec.gov/Archives/edgar/data/1504776/000110465923051501/tm2313488d3_ars.pdf (last visited Sept. 10, 2023).

118.    Even EssilorLuxottica executives have admitted that EssilorLuxottica possesses market power. Norbert Gorny, then head of research and development for Essilor (now co-chief operating officer and director), stated about the merger of Essilor and Luxottica: "There is nothing close to that firepower once the combination is done. You have the global footprint. You can play all the counts."[22]

VIII.   BARRIERS TO ENTRY

119.    There are significant barriers to entry in the Eyewear Market.

120.    Consumers have brand loyalty. EssilorLuxottica owns, or controls through Exclusive Licensing Agreements and Sales Agreements, nearly all of the major brands of Eyewear. A consumer will not expect a new brand of Eyewear to be as high quality as, for instance, Ray-Ban or Oakley sunglasses, or Gucci or Dolce & Gabbana eyeglasses.

121.    Manufacturing facilities are expensive to build. For instance, when Warby Parker built an optical lab in New York State in 2016, it estimated the cost to construct and outfit the lab at $16 million.[23]

122.    Stores are expensive to open, and impossible to open at scale to challenge EssilorLuxottica at the retail level. There are currently 1,520 Sunglass Hut stores in the United States. There are 935 LensCrafters stores in the United States. Pearle Vision has

---

[22]  Sam Knight, *The Spectacular Power of Big Lens*, The Guardian (May 10, 2018), https://www.theguardian.com/news/2018/may/10/the-invisible-power-of-big-glasses-eyewear-industry-essilor-luxottica (last visited Sept. 9, 2023).

[23]  Elizabeth Segran, *Warby Parker Is Opening an Enormous New Optical Lab in Rockland County*, Fast Company (June 27, 2016), https://www.fastcompany.com/4011943/warby-parker-is-opening-an-enormous-new-optical-lab-in-rockland-county (last visited Sept. 9, 2023).

another 400 locations. A rival expanding to compete with EssilorLuxottica would find it cost prohibitive to open enough stores to make a dent in the market, particularly since many of these stores also carry positive recognition with consumers that will lead consumers to believe a new rival's stores offers an inferior product.

123.  EssilorLuxottica's long-term Exclusive Licensing Agreements are barriers to entry because an entrant would not even have the opportunity to reach agreements with the Fashion Houses to sell their Licensed Brands.

IX.   ANTITRUST INJURY

124.  Plaintiff and the Class suffered antitrust injury.

125.  EssilorLuxottica's anticompetitive conduct resulted in lessened competition in the Eyewear Market. This lessened competition allowed EssilorLuxottica to charge supracompetitive prices to consumers for Eyewear, or to require its co-conspirators to charge supracompetitive prices for Eyewear.

126.  The purpose of EssilorLuxottica's conduct was to exclude competition and collect monopoly rents for its Proprietary Brands and Licensed Brands.

127.  The precise amount of the overcharge during the Class Period can be measured and quantified using well-accepted models used by economists, statisticians, or econometricians.

128.  Because of the lessened competition in the Eyewear Market, in addition to competition to discipline their pricing, there is insufficient competition to require them to improve their non-price services.

129.    Defendants have suffered numerous data breaches, which have resulted in the loss of their customers' personal data, including personally identifiable information and protected medical information. These include a 2020 EyeMed data breach affecting 2.1 million individuals, an EssilorLuxottica data breach in August 2020 affecting over 800,000 EyeMed and LensCrafters patients, and a 2021 Essilor Luxottica data breach that exposed the personal data of approximately 70 million individuals.

130.    By reason of the alleged violations of the antitrust laws, Plaintiff and Class members have sustained injury, described above, which they would not have suffered but for the anticompetitive conduct described in this Complaint. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

X.    CLASS ACTION ALLEGATIONS

131.    Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the proposed Direct Purchaser Plaintiff Class defined as follows:

> Any person in the United States who purchased, for their personal or household consumption, one or more of Defendants' Proprietary Brands or Licensed Brands of Eyewear directly from one or more of Defendants' Retail Outlets or Defendants' co-conspirators during the Class Period.

> Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, and the Court and its personnel assigned to this matter.

132.    The Class is so numerous that joinder of all members would be impracticable. While Plaintiff does not know the exact number of Class members, based on the commerce at issue and Defendants' market share, there are likely millions of Class members.

133.    Common questions of law and fact exist as to all Class members. Defendants' conduct was generally applicable to all Class members, thereby making it appropriate for the Court to grant relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a.    Whether Defendants entered into Exclusive Licensing Agreements.

b.    Whether Defendants entered into Sales Agreements.

c.    Whether Defendants entered into MFN Agreements.

d.    Whether Defendants entered into RPM Agreements.

e.    Whether Defendants possess market power in the Eyewear Market.

f.    Whether Defendants charged supracompetitive prices for their Eyewear.

g.    Whether Defendants required or incentivized third parties to charge supracompetitive prices for their Eyewear.

h.    Whether Defendants' conduct unreasonably restrained trade or lessened competition.

i.    Whether Class members sustained antitrust injury.

j.    The measure of damages suffered by the Class.

k.      Whether injunctive and declaratory relief is appropriate to put a stop to Defendants' anticompetitive conduct and the harms it continues to cause.

134.    Plaintiff's claims are typical of the claims of the absent Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class that Plaintiff seeks to represent were similarly affected by Defendants' wrongful conduct in that they paid supracompetitive prices for Eyewear and suffered non-price injury in the form of reduced service quality.

135.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members that Plaintiff seeks to represent. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class that Plaintiff seeks to represent. Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex antitrust class action litigation.

136.    The questions of law and fact common to Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

137.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Among other things, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities

with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

138.   Defendants have acted or refused to act on grounds that generally apply to the whole Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## XI.   CAUSES OF ACTION

### COUNT I
Monopolization (15 U.S.C. § 2)

139.   Plaintiff incorporates the allegations in the above numbered paragraphs.

140.   The relevant product market is the Eyewear Market.

141.   The relevant geographic market is the United States.

142.   EssilorLuxottica possesses monopoly price-setting power in the United States for Eyewear. EssilorLuxottica willfully acquired and maintains that market power through anticompetitive, exclusionary, and predatory conduct, which EssilorLuxottica intended to have, and did actually have, the effects of foreclosing competition in the Eyewear Market and inflating the price of Eyewear.

143.   As described in more detail above, EssilorLuxottica's acquisitions center on acquiring market power and using its market power to prevent would-be competitors from entering the market or gaining market share and to suppress competition.

144.   EssilorLuxottica's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Antitrust Act.

145.    As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Antitrust Act, prices of EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear in the Eyewear Market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

146.    Plaintiff, on behalf of herself and the Class, seeks damages and injunctive relief. The violations described above and the effects thereof are continuing and will continue unless injunctive relief is granted.

<u>COUNT II</u>
Attempted Monopolization (15 U.S.C. § 2)

147.    Plaintiff incorporates the allegations in the above numbered paragraphs.

148.    The relevant product market is the Eyewear Market.

149.    The relevant geographic market is the United States.

150.    If EssilorLuxottica does not already have monopoly power in the United States for Eyewear, it has attempted to monopolize this market. EssilorLuxottica attempted to possess monopoly price-setting power in the United States for Eyewear. EssilorLuxottica specifically attempted to acquire and maintain that market power through anticompetitive, exclusionary, and predatory conduct, which EssilorLuxottica intended to have the effects of foreclosing competition in the Eyewear Market and inflating the price of Eyewear.

151.    As described in more detail above, EssilorLuxottica's acquisitions center on acquiring market power and using its market power to prevent would-be competitors from entering the market or gaining market share and to suppress competition.

152.    EssilorLuxottica's unlawful conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Antitrust Act.

153.    As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Antitrust Act, prices of EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear in the Eyewear Market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

154.    Plaintiff, on behalf of herself and the Class, seeks damages and injunctive relief. The violations described above and the effects thereof are continuing and will continue unless injunctive relief is granted.

<u>COUNT III</u>
Unlawful Minimum RPM Agreements (15 U.S.C. § 2)

155.    Plaintiff incorporates the allegations in the above numbered paragraphs.

156.    The relevant product market is the Eyewear Market.

157.    The relevant geographic market is the United States.

158.    As described in more detail above, EssilorLuxottica has contracted with Third Party Sellers to set the prices at which EssilorLuxottica's Proprietary Brands and Licensed Brands of Eyewear are resold to consumers. In particular, EssilorLuxottica prevents discounting or advertised discounts, which has permitted it and Third Party Sellers to collect supracompetitive prices for the Eyewear.

159.    As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Antitrust Act, prices of EssilorLuxottica's Proprietary Brands

and Licensed Brands of Eyewear in the Eyewear Market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

160.    Plaintiff, on behalf of herself and the Class, seeks damages and injunctive relief. The violations described above and the effects thereof are continuing and will continue unless injunctive relief is granted.

PRAYER FOR RELIEF

161.    Plaintiff prays for judgment against Defendants as follows:

a.    The Court determine that this action may be maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appoint Plaintiff as Class Representative and her counsel of record as Class Counsel, and direct that a practicable time notice of this action be given to the Class.

b.    Judgment that Defendants' conduct constitutes violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

c.    Plaintiff and the Class recover damages to the maximum amount allowed under the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled under the antitrust laws.

d.    The Court enter an order declaring Defendants' conduct unlawful and enjoining such conduct to the extent necessary to prevent ongoing competitive harm to the Class.

e.    Plaintiff recover reasonable attorneys' fees and costs as allowed by law.

39

f.      Plaintiff recover pre-judgment and post-judgment interest at the highest rate allowed by law.

g.      Plaintiff and the Class be granted such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

162.    Plaintiff demands a trial by jury as to all matters so triable.


Dated: October 3, 2023                    ***/s/ Heidi M. Silton***
                                          Heidi M. Silton (MN #025759X)
                                          Kristen G. Marttila (MN #0346007)
                                          Jessica N. Servais (MN #0326744)
                                          Joseph C. Bourne (MN #0389922)
                                          LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                          100 Washington Avenue South, Suite 2200
                                          Minneapolis, MN 55401
                                          Tel: (612) 339-6900
                                          Fax: (612) 339-0981
                                          hmsilton@locklaw.com
                                          kgmarttila@locklaw.com
                                          jnservais@locklaw.com
                                          jcbourne@locklaw.com

                                          *Attorneys for Plaintiff Michelle Morgan and the Proposed Class*